# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### June 4, 2008 Session

## STATE OF TENNESSEE v. PHEDREK T. DAVIS

**Appeal by permission from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 2003-D-2992     Seth Norman, Judge**

---

**No. M2006-00198-SC-R11-CD - Filed October 17, 2008**

---

We granted the Defendant's request for permission to appeal to address the propriety of jury instructions requiring the jury to reach a unanimous decision to acquit of a greater offense before considering a lesser-included offense. We hold that such jury instructions are proper and do not violate the Defendant's right to trial by jury. We also hold that the trial court's imposition of consecutive sentences did not violate the Defendant's federal Sixth Amendment rights. While the Defendant has raised several other issues, we have determined that the Court of Criminal Appeals correctly held that they do not entitle the Defendant to relief. Accordingly, we affirm the Defendant's convictions and sentences.

**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Affirmed**

CORNELIA A. CLARK, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., AND WILLIAM M. BARKER, and WILLIAM C. KOCH, JR., JJ., joined. GARY R. WADE, J., filed a concurring opinion.

Kathleen G. Morris and Anne M. Davenport, Nashville, Tennessee, for the appellant, Phedrek T. Davis.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; Rachel E. Willis, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Renee Erb, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of the shooting death of Susan Phelps on August 21, 2003, as she stood inside her apartment in Nashville, Davidson County, Tennessee.

Mr. Eula Beasley testified that he had known the victim two to three months prior to her death and had visited her apartment "a lot." On the day of the shooting, Mr. Beasley was at the victim's apartment along with several other people. Because the electricity was out in the apartment, the victim had run an extension cord from the Defendant's apartment to hers. According to Mr. Beasley, the Defendant (appellant Phedrek T. Davis) saw the victim coming out of his apartment and accosted her on the sidewalk. Mr. Beasley was standing next to the victim when this occurred. The Defendant slapped her across her face and said, "bitch, I'm going to get you, don't be in this house when I come back." Mr. Beasley had previously told one of the detectives that the Defendant also threatened "to kill her when he come [sic] back, he was going to shoot up the house and everything."

After this altercation, Mr. Beasley and the victim were both in the victim's living room "having fun." Mr. Beasley explained that he had not taken the Defendant's threats seriously. Within fifteen minutes, Mr. Beasley saw the Defendant walking fast toward the victim's apartment. As the Defendant came abreast of the living room window, which was open, he began shooting into the apartment through the window. The Defendant continued walking and shooting. Mr. Beasley described the gun as an automatic which the Defendant was firing with one hand. The victim was standing "right in front of the window." When the gunfire began, Mr. Beasley turned and ran to a back room where he broke a window and jumped out. He did not see the victim get shot. He did, however, hear "a bunch" of shots.

After jumping through the window, Mr. Beasley ran up the alleyway, where he hid in some bushes out of fear. From there, he saw the Defendant drive by.

On cross-examination, Mr. Beasley admitted that he had been smoking crack cocaine on the day of the shooting. He also admitted to an aggravated burglary and several theft convictions.

George Boone testified that he had known the victim several months before her death. On the day of the shooting, he and several other people were at the victim's apartment. The victim was walking outside. Mr. Boone stated that, while he was standing in her living room looking out the door, he saw an altercation between the Defendant and the victim; he saw no one else present during the argument. Mr. Boone heard the Defendant call the victim "bitch" and state, "somebody got my stuff." He saw the Defendant slap the victim, after which she walked a short distance away. The Defendant also left. After the victim returned to her apartment, the Defendant "came to the door after that and said, somebody got my shit, you-all need to get up out of here." Mr. Boone testified, "He said I don't care if it's your husband or whoever is in there, when I come back I'm going to shoot this m***** f***** up." None of the other people in the apartment responded to the Defendant, but Mr. Boone "told them, they need to come out of there because of what he said." Although the others did not take the Defendant's threat seriously, Mr. Boone did, and he walked out of the apartment.

Mr. Boone stationed himself a short distance away, in front of the apartment. From his position, he could look through the living room window; he saw the victim sitting in front of it. Fifteen to thirty minutes later, he saw the Defendant returning. The Defendant walked over to near where Mr. Boone was standing, reached down, and "come [sic] up with a pistol." The Defendant pointed the gun and "opened fire." Mr. Boone stated that the Defendant shot through the window

2

and that he shot from right to left. Neither man spoke to the other. When he was done shooting, the Defendant "just walked on back around the building" where he got in a car and drove away.

Mr. Boone went to the apartment and looked in. He saw the victim lying on the floor.

Dr. Stacy Turner testified about the victim's autopsy. According to Dr. Turner, the victim had suffered a gunshot wound to the face in which the bullet perforated the victim's right carotid artery and caused her death. The bullet was recovered from the victim's body.

Officer William Kirby, a member of the identification crime scene section of the Metro Nashville Police Department, testified that he reported to the scene of the crime at about 4:30 in the afternoon on the day it occurred. He stated that it was a bright and sunny day and that he could see through the apartment's living room window (which was open) into the interior. Officer Kirby confirmed that the apartment had no electricity. He composed an accurate, although not to scale, drawing of the scene. The drawing depicted an apartment with a front door between two front windows. The door and window to the right of the door (from the perspective of one approaching the door from the outside) were along the outside wall of the living area. The window to the left of the door was along the outside wall of a bedroom. The living room window bore three bullet strikes: two to the frame and one through the screen. The front door frame bore one bullet strike. The bedroom window bore four bullet strikes–one to the frame and three through the glass–and the interior wall of the bedroom (parallel with the outside wall in which the window was located) also bore four bullet strikes. In the area in front and outside of the bedroom window, six 40 caliber shell casings were found. In the living room, a lead bullet was found; in the kitchen, near where the victim fell, a copper jacket was found. In the bathroom, another copper jacket was found and in the back bedroom, another lead bullet.[1]

Officer Kirby testified that, although he and other members of the unit searched "front, back and side" for shell casings, the only ones they found were in the area fronting the bedroom window. He also opined that "at least five [bullets] made it inside of the apartment."

Detective David Achord testified that he was the primary investigator in the case. He attended the victim's autopsy. He took custody of the bullet recovered from the victim's body and submitted it for ballistics testing. He also submitted for ballistics testing the projectiles and shell casings recovered from the crime scene. He took out a warrant for the Defendant's arrest on August 22, 2003, the day after the victim was killed, but the Defendant was not taken into custody until September 30, 2003.

Officer Kendall Jaeger testified that he is a "firearm tool mark examiner in the forensics and firearms section of the identification section" of the Metro Nashville Police Department. He examined the projectiles and discharged cartridge cases that were recovered during the investigation of this case. He determined that the six cartridge cases had all been discharged from a single weapon and that the weapon was a semi-automatic handgun.

---

[1]An expert witness explained to the jury that the type of bullets recovered from the scene consisted of an inner lead core surrounded by a copper brass alloy jacket and that the two layers sometimes separated on impact.

Officer Jaeger was unable to identify the bullet that was recovered from the victim's body because the metal jacket surrounding the lead core had been stripped away. He identified two complete bullets recovered from the scene and two bullet jackets recovered from the scene as having been fired from the same gun. Because the gun that fired the cartridges was not recovered, however, he was unable to state conclusively that the cartridge cases and the bullets/bullet jackets were fired from one and the same gun. He acknowledged, however, that it was reasonable to infer that the same gun fired both the cartridge cases and the bullets.

Detective Roy Dunaway testified that he assisted in booking the Defendant. Using a photograph known to be of the Defendant, Det. Dunaway asked the Defendant if the photograph was of him. The Defendant acknowledged that the photograph was of him and inquired, "what's this about?" Det. Dunaway told the Defendant that there was a criminal homicide warrant on him but that he did not know anything about the case. The Defendant stated that he had not killed anyone. Det. Dunaway said that he did not have any information on the case and that he did not "know anything about the dude that got killed." The Defendant then stated, "it wasn't a dude, it was a lady." Det. Dunaway acknowledged that the police department had publicized the murder and its search for the Defendant prior to his apprehension.

The defense presented no proof.

In its charge to the jury, the trial court gave the following instruction on first degree premeditated murder:

> First degree premeditated murder. Any person who commits first degree murder is guilty of a crime.
>
> For you to find the Defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> One, that the Defendant unlawfully killed Susan Phelps; and
>
> Two, that the Defendant acted intentionally. A person acts intentionally when it is the person's conscious objective or desire to cause the death of the alleged victim; and
>
> Three, that the killing was premeditated.
>
> You may refer to the definition page for definitions previously set out.
>
> If, after considering all the evidence and the Court's instructions, you find beyond a reasonable doubt that the Defendant is guilty of first degree premeditated murder of Susan Phelps, as charged in count two of the indictment, the form of your verdict would then be: We, the jury, find the Defendant guilty of first degree premeditated murder of Susan Phelps as charged in count two of the indictment. The Court will thereafter set the punishment after a separate sentencing hearing.

4

*On the other hand, if you find the Defendant not guilty of first degree premeditated murder of Susan Phelps, as charged in count two of the indictment, or if you have a reasonable doubt thereof, then you must acquit him, and your verdict must be not guilty, as to this offense. You must then consider the lesser included offense of . . . second degree murder.*[2]

(Emphasis added). Similar instructions were given with respect to the additional lesser-included offenses of voluntary manslaughter, reckless homicide, and criminally negligent homicide.[3] Later in the charge, the trial court instructed the jury:

The crime charged in each count of the indictment is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it. The Defendant may be found guilty or not guilty of any or all of the offenses charged or included. Your finding as to each crime charged must be stated in your verdict.

*The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.*

(Emphasis added).

After deliberating, the jury convicted the Defendant of the first degree premeditated murder of Susan Phelps, the attempted second degree murder of Eula Beasley, and the misdemeanor assault of Susan Phelps. The trial court subsequently sentenced the Defendant to life imprisonment for the first degree murder; a consecutive term of fifteen years for the attempted second degree murder; and a concurrent term of eleven months, twenty-nine days for the misdemeanor assault. The Court of Criminal Appeals affirmed the Defendant's convictions and sentences. We accepted this appeal primarily to address the Defendant's contention that requiring a jury to reach a unanimous verdict of not guilty on a greater offense before it may consider lesser-included offenses "is inconsistent with the Tennessee Constitution and Tennessee case law."

---

[2]The trial court's instruction in this regard was substantially similar to that suggested in Tennessee's Pattern Jury Instructions: "If you have a reasonable doubt as to the defendant's guilt of *[insert offense charged]* as charged in *[count __ of]* the indictment, then your verdict must be not guilty as to this offense, and then you shall proceed to determine whether the defendant is guilty or not guilty of the lesser included offense of *[insert lesser included offense]*." T.P.I.–Crim. 41.01 (11th ed. 2007) (footnote omitted). Although the Pattern Jury Instructions do not have the force of law, our trial courts "frequently use them as a source for jury instructions." State v. Rutherford, 876 S.W.2d 118, 120 (Tenn. Crim. App. 1993).

[3]The trial court similarly instructed the jury with respect to the charged offense of the attempted first degree premeditated murder of Eula Beasley and its lesser-included offenses.

## STANDARD OF REVIEW

We review issues of constitutional law de novo with no presumption of correctness attaching to the legal conclusions reached by the courts below.  State v. Burns, 205 S.W.3d 412, 414 (Tenn. 2006).

## ANALYSIS

### I. Tennessee's Right to Jury Trial

We first address the Defendant's contention that the trial court's charge to the jury violated his right to a jury trial under Tennessee's constitution.  Our state constitution provides that "the right of trial by jury shall remain inviolate."  Tenn. Const. art. I, § 6.

> In Tennessee, this right dictates that all issues of fact be tried and determined by twelve jurors.  Thus, it follows that a defendant has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions.

State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000) (citations omitted).  This Court has long recognized that the constitutional right to "a correct and complete charge of the law," id., includes the right to jury instructions on each and every lesser-included offense embraced within the charged offense(s) and supported by the proof, see State v. Ely, 48 S.W.3d 710, 727 (Tenn. 2001); State v. Staggs, 554 S.W.2d 620, 626 (Tenn. 1977), overruled on other grounds by State v. Williams, 977 S.W.2d 101, 106 n.7 (Tenn. 1998); Strader v. State, 362 S.W.2d 224, 230 (Tenn. 1962).  This Court has not previously addressed, however, whether the order and manner in which a jury considers a charged offense and its lesser-included offenses implicates the constitutional right to trial by jury.[4]

A brief review of some of this Court's recent decisions regarding lesser-included offenses is helpful to our analysis.  In State v. Burns, 6 S.W.3d 453 (Tenn. 1999), this Court conducted a comprehensive review of Tennessee's statutory mandate that trial courts charge juries as to the law of each offense included in an indictment.  Id. at 464 (citing Tenn. Code Ann. § 40-18-110 (1997)).[5] This Court recognized the benefits of providing a jury with the option of convicting a defendant of an offense less serious than the one charged: "'[P]roviding the jury with the "third option" of convicting on a lesser included offense ensures that the jury will accord the defendant the full benefit

---

[4]Our Court of Criminal Appeals has repeatedly approved of instructions that require a jury to reach a unanimous verdict of acquittal on each greater offense before proceeding to consider the next lesser-included offense, however.  See, e.g., State v. Raines, 882 S.W.2d 376, 381-82 (Tenn. Crim. App.), perm. app. denied (Tenn. 1994); State v. McPherson, 882 S.W.2d 365, 375-76 (Tenn. Crim. App.), perm. app. denied (Tenn. 1994); State v. Rutherford, 876 S.W.2d 118, 119-20 (Tenn. Crim. App. 1993), perm. app. denied (Tenn. 1994).  In State v. Mann, 959 S.W.2d 503 (Tenn. 1997), this Court adopted without analysis the Court of Criminal Appeals' holding to that effect.  See id. at app. 521.  Tennessee's Rules of Criminal Procedure also contemplate the use of acquittal-first instructions in cases where lesser-included offenses are charged.  See Tenn. R. Crim. P. 31(d)(2).

[5]This statutory provision has since been superceded.  See Tenn. Code Ann. § 40-18-110 (2006).

of the reasonable-doubt standard.'" Id. (quoting Beck v. Alabama, 447 U.S. 625, 634 (1980)).  The Court also stressed the dangers inherent in failing to provide a jury with the option of convicting of a lesser-included offense where the prosecution has established *some* criminal conduct beyond a reasonable doubt: "Such a scenario forces a jury into an 'all or nothing' decision that, unfortunately, is likely to be resolved against the defendant, who is clearly guilty of 'something.'" Id. at 466. Accordingly, this Court held that a trial court must instruct a jury on lesser-included offenses where the trial court determines that (1) the particular lesser offense is included in the greater offense charged (using the calculus set forth in Burns[6]); (2) the record contains evidence that reasonable minds can accept as to the lesser-included offense; and (3) that evidence is legally sufficient to support a conviction for the lesser-included offense.  Id. at 467-69.

In State v. Ely, this Court recognized that "the right to lesser-included offense instructions does not derive *only* from statute," 48 S.W.3d at 726, but that "the right has both a statutory and a constitutional basis," id. at 727, specifically, the Tennessee Constitution's guarantee that "the right of trial by jury shall remain inviolate."  We therefore held that "this constitutional right is violated when the jury is not permitted to consider *all* offenses supported by the evidence." Id.  It is upon this statement that the Defendant bases his claim that the trial court's acquittal-first jury instructions in this case were unconstitutional.

The Defendant asserts that acquittal-first jury instructions do not permit a jury to consider *all* of the offenses supported by the evidence in a given trial because the jury is not permitted to consider *any* lesser-included offenses until it has unanimously determined that the defendant is not guilty of the charged (greater) offense.  And, once it decides to convict of a greater offense, it never considers any remaining lesser-included offenses.  The Defendant asserts that prohibiting a jury from considering lesser-included offenses unless and until it unanimously acquits of all greater offenses flies in the face of our declaration in Ely.  Under the Defendant's interpretation of Ely, a jury must be permitted to consider simultaneously all of the offenses included in the charged offense, eventually arriving upon any verdict of guilt without necessarily reaching unanimous agreement as to the charged and/or any remaining included offenses.

The Defendant stretches our language in Ely beyond the framework it was designed to fit. In Ely, this Court was addressing the appropriate standard of review to be applied in assessing a trial court's error in failing to instruct the jury about lesser-included offenses called for by the indictment and proof in the case.  Ely, 48 S.W.3d at 725, 727.  The issue was significant because the standard of review differs depending upon whether the error is constitutional error or non-constitutional error. See State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) (recognizing structural constitutional error, non-structural constitutional error, and non-constitutional error as the three categories of error and that the category into which any alleged error falls defines the standard of appellate review). Because this Court determined that a defendant's right to instructions on lesser-included offenses stemmed not only from statute but also from Tennessee's Constitution, we held in Ely that "when determining whether an erroneous failure to instruct on a lesser-included offense requires reversal, we hold that the proper inquiry for an appellate court is whether the error is harmless *beyond a*

---

[6]An offense may also be designated by our legislature to be a lesser-included offense.  State v. Elkins, 83 S.W.3d 706, 710-11 (Tenn. 2002).

*reasonable doubt.*" 48 S.W.3d at 727 (emphasis added). That is, the Ely Court utilized the standard of review applicable to non-structural constitutional errors. Significantly, the Ely Court did *not* hold that a defendant's constitutional right to a jury trial was violated when the jury did not *in fact* consider every single lesser-included offense charged before returning a verdict of guilt on a greater charge. Indeed, in cases where the jury convicts of the indicted offense after having also been instructed on the immediate lesser-included offense (e.g. first degree murder and second degree murder), this Court has found no reversible error where the trial court erroneously failed to give an instruction on a more remote lesser-included offense. See, e.g., State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998) (where defendant was convicted of first degree murder after trial court gave instruction on lesser-included offense of second degree murder but erroneously failed to instruct on voluntary manslaughter, trial court's error was harmless beyond a reasonable doubt because "by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, second degree murder, the jury necessarily rejected all other lesser offenses, including voluntary manslaughter").

Ely does not, therefore, stand for the proposition the Defendant advocates. Cf. State v. Sawyer, 630 A.2d 1064, 1070 (Conn. 1993) (observing that "the lesser included offense doctrine . . . does not imply that the jury should be allowed to consider the charged offense and lesser included offenses in any order and with whatever degree of dedication it chooses").

We also deem it significant to our analysis that the Tennessee Constitution's right to trial by jury under article 1, section 6 includes the right to a unanimous jury verdict. State v. Scarbrough, 181 S.W.3d 650, 658 (Tenn. 2005); State v. Cleveland, 959 S.W.2d 548, 551 (Tenn. 1997); see also Allen v. United States, 164 U.S. 492, 501 (1896) ("The very object of the jury system is to secure unanimity by a comparison of views and by arguments among the jurors themselves."). A jury cannot convict a defendant unless and until it reaches a unanimous verdict of guilt. By the same token, a jury cannot acquit a defendant unless and until it reaches a unanimous verdict of not-guilty. Thus, the unanimity requirement works to benefit both the defendant and the prosecution.[7] An acquittal-first jury instruction regarding the proper order in which the jury is to consider the charged and lesser-included offenses is consistent with this unanimity requirement.

We also point out that a jury considering a greater offense, by necessity, simultaneously considers, albeit not explicitly, all applicable lesser-included offenses supported by the proof.[8] See Dresnek v. State, 697 P.2d 1059, 1062 (Alaska Ct. App. 1985) ("[A] jury cannot consider the elements of the greater offense without simultaneously considering the elements of the lesser-included offense."). For instance, a jury considering first degree premeditated murder must consider whether the defendant (1) unlawfully killed the victim; (2) did so intentionally; and (3) did so with premeditation. See Tenn. Code Ann. § 39-13-202(a)(1) (2003). By comparison, when considering

---

[7]Juries that are unable to reach a unanimous verdict are commonly described as "hung." In that event, the defendant is subject to being retried.

[8]This is the case at least with respect to those lesser-included offenses whose statutory elements are included within the statutory elements of the offense charged, the first of three categories of lesser-included offenses set forth in Burns.

second degree murder, the jury must consider whether the defendant (1) unlawfully killed the victim; and (2) did so knowingly. See id. § 39-13-210(a)(1) (2003). Of course, when the jury is considering the second element of the greater offense–whether the defendant killed the victim intentionally–it is necessarily and simultaneously considering whether the defendant acted knowingly: "When the law provides that . . . acting knowingly suffices to establish an element, that element is also established if a person acts intentionally." Id. § 39-11-301(a)(2) (2003). When considering whether a defendant intentionally killed the victim, then, the jury is simultaneously considering whether the defendant knowingly killed the victim. A defendant is therefore not "cheated" out of a jury's consideration of lesser-included offenses simply because the jury is required to deliberate, and may convict, on the greater offense, first.[9]

We hold, therefore, that, while a defendant is entitled by our constitution to have the jury charged on all offenses encompassed within the indictment and supported by the proof, our constitution does not go so far as to mandate the order in which those offenses are considered. Our constitution also does not prohibit the requirement that a jury first reach a unanimous verdict of acquittal with respect to a greater offense before it proceeds to consider a defendant's guilt of a lesser-included offense. We therefore reject the Defendant's contention that the trial court's acquittal-first instructions in this case violated his state constitutional right to trial by jury.[10]

## II. Policy Considerations

Having concluded that the trial court's acquittal-first instruction did not offend the Defendant's right to a jury trial under Tennessee's Constitution, we also consider the public policy concerns inherent in what some courts refer to as the "transitional instruction." See, e.g., State v. Daulton, 518 N.W.2d 719, 720 (N.D. 1994). As noted in the concurring opinion, there is "a wide divergence of opinion" on the issue of the order and manner in which a trial court instructs a jury to consider an indicted offense together with any appropriate lesser-included offenses, id. at 721, and jurisdictions have devised at least four alternatives for its resolution, see State v. LeBlanc, 924 P.2d 441, 444 (Ariz. 1996) (Martone, J., concurring). Like Tennessee, several other jurisdictions use an acquittal-first charge. See, e.g., United States v. Moccia, 681 F.2d 61, 64 (1st Cir. 1982); Sawyer, 630 A.2d at 1075; State v. Raudebaugh, 864 P.2d 596, 598-601 (Idaho 1993); Walker v. State, 671 So.2d 581, 607-08 (Miss. 1995); State v. Taylor, 677 A.2d 1093, 1097 (N.H. 1996); People v. Boettcher, 505 N.E.2d 594, 598 (N.Y. 1987); Daulton, 518 N.W.2d at 722-23; State v. Wilson, 173

_____

[9]Indeed, the Defendant was charged in this case with the attempted first degree murder of Eula Beasley. The jury unanimously acquitted the Defendant of this offense and convicted him instead of the lesser-included offense of the attempted second degree murder of Eula Beasley.

[10]The Defendant also contends in his brief to this Court that "requiring the jury to first reach an acquittal on the offense charged in the indictment before considering the next lesser-included offense impermissibly intrudes upon the independence of jury deliberations." The Defendant cites to no case so holding and we reject the notion that instructing a jury on the order and manner in which it is to consider the offenses of which it may convict a defendant is any sort of impermissible intrusion. Additionally, the Defendant makes a reference to Sullivan v. Louisiana, 508 U.S. 275 (1993), as supporting the notion that an acquittal-first jury instruction offends the federal constitution's Sixth Amendment right to trial by jury. The Sullivan case does not stand for the proposition that acquittal-first jury instructions violate the United States Constitution and we have found no United States Supreme Court decision that contains such a holding. We therefore reject the Defendant's argument to this effect.

P.3d 150, 152 (Or. Ct. App. 2007). At least two states use a modification of the acquittal-first instruction, allowing the jury to consider lesser-included offenses before acquitting on the greater offense, but nevertheless requiring the jury to unanimously acquit on the greater offense before returning a verdict on the lesser-included offense. See Dresnek, 697 P.2d at 1060-64; People v. Kurtzman, 758 P.2d 572, 576-80 (Cal. 1988).

Several states use a "reasonable efforts" or "unable to agree" instruction which allows the jury to consider lesser-included offenses if it cannot reach a verdict on the greater offense after having made reasonable efforts to do so. See, e.g., LeBlanc, 924 P.2d at 442-44; People v. McGregor, 635 P.2d 912, 914 (Colo. Ct. App. 1981); Cantrell v. State, 469 S.E.2d 660, 662 (Ga. 1996); State v. Ferreira, 791 P.2d 407, 408-09 (Haw. Ct. App. 1990); State v. Korbel, 647 P.2d 1301, 1305 (Kan. 1982); People v. Handley, 329 N.W.2d 710, 712 (Mich. 1982); Tisius v. State, 183 S.W.3d 207, 217 (Mo. 2006) (en banc); Green v. State, 80 P.3d 93, 95-96 (Nev. 2003); State v. Chamberlain, 819 P.2d 673, 680-81 (N.M. 1991); State v. Thomas, 533 N.E.2d 286, 292-93 (Ohio 1988); Graham v. State, 27 P.3d 1026, 1027 (Okla. 2001); State v. Gardner, 789 P.2d 273, 284 (Utah 1989); State v. Labanowski, 816 P.2d 26, 35-37 (Wash. 1991); State v. Truax, 444 N.W.2d 432, 436 (Wis. Ct. App. 1989). A few other jurisdictions use the "optional approach." This method allows the defendant to choose whether the jury is instructed with an "acquittal-first" or a "reasonable efforts" instruction. See United States v. Tsanas, 572 F.2d 340, 346 (2d Cir. 1978); Catches v. United States, 582 F.2d 453, 459 (8th Cir. 1978); United States v. Jackson, 726 F.2d 1466, 1469 (9th Cir. 1984); Jones v. United States, 620 A.2d 249, 252 (D.C. 1993); State v. Powell, 608 A.2d 45, 47 (Vt. 1992). See also Mont. Code Ann. § 46-16-607(3) (2007).

The United States Court of Appeals for the Second Circuit has succinctly stated the competing policy concerns inherent in a transitional instruction:

> [An acquittal-first instruction] has the merit, from the Government's standpoint, of tending to avoid the danger that the jury will not adequately discharge its duties with respect to the greater offense, and instead will move too quickly to the lesser one. From the defendant's standpoint, it may prevent any conviction at all; a jury unable either to convict or acquit on the greater charge will not be able to reach a lesser charge on which it might have been able to agree. But it entails disadvantages to both sides as well: By insisting on unanimity with respect to acquittal on the greater charge before the jury can move to the lesser, it may prevent the Government from obtaining a conviction on the lesser charge that would otherwise have been forthcoming and thus require the expense of a retrial. It also presents dangers to the defendant. If the jury is heavily for conviction on the greater offense, dissenters favoring the lesser may throw in the sponge rather than cause a mistrial that would leave the defendant with no conviction at all, although the jury might have reached sincere and unanimous agreement with respect to the lesser charge.

> An instruction permitting the jury to move on to the lesser offense if after all reasonable efforts it is unable to reach a verdict on the greater likewise has advantages and disadvantages to both sides–the mirror images of those associated

with the [acquittal-first] charge . . . . It facilitates the Government's chances of getting a conviction for something, although at the risk of not getting the one that it prefers. And it relieves the defendant of being convicted on the greater charge just because the jury wishes to avoid a mistrial, but at the risk of a conviction on the lesser charge which might not have occurred if the jury, by being unable to agree to acquit on the greater, had never been able to reach the lesser.

Tsanas, 572 F.2d at 346 (footnote omitted).

Upon our review of the afore-mentioned and other cases, we are persuaded that significant policy considerations favor the continued use of acquittal-first jury instructions.

First, as we have already recognized, the acquittal-first approach satisfies the requirement that the jury render its verdicts unanimously. As a concomitant benefit, a unanimous verdict on each greater charge "'helps to assure the reliability of the ultimate verdict.'" Sawyer, 630 A.2d at 1074 (quoting State v. Daniels, 542 A.2d 306, 315 (Conn. 1988)).

Second, the acquittal-first approach facilitates a trial court's duty "to structure the jurors' deliberations in a manner that permits them to perform in an orderly fashion their factfinding function in relation to the charged crime and any lesser included offenses." Id. at 1071. The duty every juror undertakes in determining whether a criminal defendant has been proven guilty of committing an offense is one of our most hallowed rites of citizenship. The persons who perform this rite and decide whether to encroach upon a fellow citizen's liberty are usually untrained in the law and unfamiliar with its myriad intricacies. They make their decision on the basis of a set of instructions issued by the trial judge. We fully recognize that jury instructions can be confusing, tedious, and perhaps initially overwhelming to a juror. Presenting the jury with a structure to follow in its deliberations is, we are convinced, beneficial to all parties involved. It alleviates any internal struggles the jury may experience in setting its agenda, it requires the jury to focus and concentrate on one offense at a time, and it prevents the potential confusion arising from some jurors deliberating on one offense while other jurors deliberate upon another. We reject as both unwieldy and unsound the Defendant's suggestion in his brief to this Court that the jury be instead instructed "to consider the charged offense and all lesser included offenses in any order it deems appropriate, [and] that it must consider all lesser included offenses during its deliberations."

Third, and related to our second consideration, an acquittal-first instruction encourages thorough deliberation. See Sawyer, 630 A.2d at 1074. "[A] jury deliberating under a reasonable efforts instruction can too easily reach a compromise verdict based on sympathy or on a desire to end jury service. In doing so, it might ignore evidence that would support a guilty verdict on a more serious charge." Taylor, 677 A.2d at 1097 (citations omitted). Of course, the jury's primary responsibility is to determine whether the State has proved the facts necessary to convict the defendant. A jury that is required to reach unanimity as to each set of facts applicable to the greater offense before it may consider a lesser offense (if ever) is, we are convinced, more likely to focus with the depth of concentration appropriate to the gravity of its task.

Fourth, as alluded to above, an acquittal-first approach reduces the risk of a compromise

11

verdict. As aptly noted by the Connecticut Supreme Court:

> Although the jury may initially be instructed concerning lesser included offenses, and may eventually turn to these lesser included offenses to reach a verdict, it should not be given an instruction that could encourage it to give the charged offense short shrift and to turn to lesser included offenses in order to reach a compromise verdict virtually at the outset of its deliberations. Only after it has confronted and unanimously completed the difficult task of deciding the guilt or innocence of the accused as to the charged offense should the jury consider lesser included offenses. Anything less dilutes the right of the state and the defendant to have the jury give its undivided attention and most serious deliberations to the offense with which the defendant is charged and flies in the face of the unanimity requirement . . . .

Sawyer, 630 A.2d at 1073 (footnote omitted). See also Daulton, 518 N.W.2d at 722 ("The primary difficulty with the unable to agree instruction is it dilutes the requirement of unanimity and encourages the jury to bypass the charged offense on its way to a compromise verdict."); Boettcher, 505 N.E.2d at 597 ("[I]t is the duty of the jury not to reach compromise verdicts based on sympathy for the defendant or to appease holdouts, but to render a just verdict by applying the facts it finds to the law it is charged.").

Finally, while we recognize that requiring a jury to reach a unanimous verdict of not guilty on each greater offense before allowing it to consider a lesser-included offense may, on occasion, result in a mistrial, we agree with the Supreme Court of Connecticut about this concern: "The fact that a jury may occasionally be unable to reach a unanimous verdict by following the acquittal first instruction does not warrant the precipitous abandonment of precedent by tinkering with an instruction for which the necessity of repair has not been convincingly established." Sawyer, 630 A.2d at 1074. Tennessee has utilized acquittal-first instructions for a long time. The Defendant in this case has presented us with no evidence that the acquittal-first instruction results in more mistrials than would an alternative approach. Cf. id. (rejecting defendant's challenge to acquittal-first instruction in part on basis that defendant had not "lent substance to the specter of large numbers of mistrials resulting from the instructions presently employed by citing compelling empirical, statistical or other pertinent studies" and noting also that the defendant had not "demonstrated that mistrials are now the source of an inordinate burden on the public purse or unfairly abridge a defendant's right to bring his or her trial to a conclusion before a single tribunal"). Nor has he demonstrated that Tennessee or its criminal defendants are suffering in any way from the acquittal-first instruction.

We agree with the concurrence that the sanctity of a jury's deliberations is as crucial to the criminal process as the content of its verdict. We also agree that sound policy arguments exist for the reasonable efforts instruction, just as they do for the acquittal-first approach. We do not agree, however, that we should require such a significant change to our traditional method of jury instruction when there is neither constitutional need nor demonstrated practical need to do so.

Unlike the concurrence, we do not view our long-standing practice of using the acquittal-first

12

instruction as unworkable. Moreover, jettisoning our historical approach has significant implications for the trial judges who are taxed with this duty. In the absence of any documented problems with the current practice, requiring such a change would create problems where none now exist. In short, as the saying goes, "If it ain't broke, don't fix it."

Accordingly, we hold that the trial court committed no error in issuing the acquittal-first jury instructions in this case. The Defendant is therefore entitled to no relief on this basis.

### III. Sentencing

The Defendant was sentenced to life imprisonment for his first degree murder conviction; fifteen years for his attempted second degree murder conviction; and eleven months, twenty-nine days for his misdemeanor assault conviction. The sentence for the attempted second degree murder conviction was enhanced from twelve years to fifteen years[11] on the basis of his prior criminal convictions and his previous failure to comply with the conditions of a sentence involving release into the community. See Tenn. Code Ann. § 40-35-114(2), (9) (2003). The trial court ordered the murder and assault sentences to run concurrently and the attempted second degree murder sentence to run consecutively, for an effective sentence of life plus fifteen years.

The Defendant contends that the trial court committed constitutional error when it enhanced his sentence for attempted second degree murder on the basis of facts not found by a jury. See Blakely v. Washington, 542 U.S. 296, 303 (2004); State v. Gomez, 239 S.W.3d 733, 740 (Tenn. 2007). We agree that the trial court erred when it relied on the Defendant's alleged previous unwillingness to comply with the conditions of a sentence involving release into the community because this contention was not put before the jury or admitted by the Defendant. Nevertheless, we agree with the Court of Criminal Appeals that the Defendant's prior criminal convictions are sufficient in and of themselves to support the Defendant's moderately enhanced sentence for attempted second degree murder.[12] The Defendant is therefore entitled to no relief as to this issue.

The Defendant also contends that the trial court's imposition of consecutive sentences violates his federal constitutional rights pursuant to the United States Supreme Court's holdings in Apprendi v. New Jersey, 530 U.S. 466 (2000), and its progeny. This Court has recently determined that Tennessee's statutory method for a trial court's imposition of consecutive sentences does not offend the federal constitution. See State v. Allen, 259 S.W.3d 671, 688 (Tenn. 2008). In this case, the trial court determined that the Defendant should serve consecutively his attempted second degree murder sentence on two bases: (1) that he is "a professional criminal who has knowingly devoted [his] life to criminal acts as a major source of livelihood," Tenn. Code Ann. § 40-35-115(b)(1) (2003); and (2) that he is "an offender whose record of criminal activity is extensive," id. at (b)(2).

---

[11]The Defendant was sentenced as a Range II multiple offender. See Tenn. Code Ann. § 40-35-106 (2003). The Range II sentence for attempted second degree murder, a Class B felony, is twelve to twenty years. See id. § 40-35-112(b)(2) (2003). The Defendant does not challenge his Range II status.

[12]Not counting the two C felonies relied upon to sentence the Defendant as a Range II offender, the Defendant's criminal history includes a significant number of misdemeanor offenses.

The trial court did not abuse its discretion in finding that the Defendant met these two criteria. Moreover, upon our review of the entire record in this case, we agree with the Court of Criminal Appeals that the length of the Defendant's effective sentence is "justly deserved in relation to the seriousness of the offense[s]," id. § 40-35-102(1), and is "no greater than that deserved for the offense[s] committed," id. § 40-35-103(2) (2003). See State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002). Accordingly, the trial court did not err in imposing a consecutive sentence in this case and the Defendant is not entitled to relief on this basis.

## IV.  Remaining Issues

The Defendant has raised several other issues, including challenges to the trial court's rulings on pretrial motions; evidentiary rulings; sufficiency of the evidence; and prosecutorial misconduct. We have reviewed these issues and have determined that the Court of Criminal Appeals reached the correct result with respect to each of them. Accordingly, the Defendant is entitled to no relief on the basis of any of the remaining issues that he has raised.

## CONCLUSION

We hold that, where a criminal defendant is entitled to jury instructions on lesser-included offenses, the trial court shall instruct the jury to consider the offenses in order from greatest to least within each count of the indictment and that it shall not proceed to consider any lesser-included offense until it has first made a unanimous determination that the defendant is not guilty of the immediately-preceding greater offense. The trial court in this case issued proper "acquittal-first" jury instructions. The Defendant is therefore entitled to no relief on this basis. The Defendant is also not entitled to relief on any of the other issues raised in his appeals to the Court of Criminal Appeals and/or this Court. The Defendant's convictions and sentences are therefore affirmed. It appearing that the Defendant is indigent, the costs of this cause are taxed to the State of Tennessee.

_____
CORNELIA A. CLARK, JUSTICE

14